**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JAMES RIVER INSURANCE COMPANY | § § § | |
| Plaintiff | § § | CIVIL ACTION NO. 4:11-CV-2937 |
| VS. | § § | |
| AFFORDABLE HOUSING OF KINGSVILLE II, LTD.; CAPSTONE REAL ESTATE SERVICES, INC.; SALLY REYES; and STEADFAST INSURANCE COMPANY | § § § § § § | JURY REQUESTED |
| Defendants | § § | |

---

### *THIRD PARTY COMPLAINT OF*
### *CAPSTONE REAL ESTATE SERVICES, INC. AND SALLY REYES*

---

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Comes Now CAPSTONE REAL ESTATE SERVICES, INC. ("Capstone") and SALLY

REYES ("Reyes"), Defendants in the above styled and numbered cause, and file this Third-Party

Complaint against Third-Party Defendants SOVEREIGN INSURANCE GROUP, INC.

("Sovereign") and JOCELYN CHAMBLESS nee HUGHES ("Hughes"), and in support thereof

would respectfully show the Court the following:

<u>1. PARTIES</u>

1.1    Plaintiff James River Insurance Company ("James River") has appeared herein, and is an

insurance company organized and existing under the laws of the State of Ohio, with its principal

place of business in Virginia.

1.2     Defendant Affordable Housing of Kingsville II, Ltd. has appeared herein, and is a domestic entity doing business in Texas with its principal office in Texas.

1.3     Defendant/Third-Party Plaintiff Capstone Real Estate Services, Inc. has appeared herein and is a domestic corporation doing business in the State of Texas with its principal place of business at 210 Barton Springs Road, Suite 300, Austin, Texas 78704.

1.2     Defendant/Third-Party Plaintiff Sally Reyes has appeared herein and is an individual residing in Kleburg County, Texas.

1.3     Third-Party Defendant Sovereign Insurance Group, Inc. is a domestic corporation doing business in the State of Texas and may be served through its Registered Agent, Michael T. Sterlacci at 14860 Montfort Drive, Suite 150, Dallas, Texas 75254.

1.4     Third-Party Defendant Jocelyn Chambless nee Hughes is an Individual residing in Harrison County, Texas, and can be served at her residence at 108 Cedar Circle, Marshall, Texas 75672, or wherever else she may be found.

## 2. JURISDICTION

2.1     The Court's original jurisdiction over this lawsuit is pursuant to 28 U.S.C. § 1332.

2.2     The Court has supplemental jurisdiction over Defendant/Third- Party Plaintiffs' claims against Third-Party Defendants according to 28 U.S.C. § 1367 because Defendant/Third-Party Plaintiffs' claims are so related to the claims within the court's original jurisdiction that they form part of the same case or controversy under Article 3 of the United States Constitution.

## 3. THE UNDERLYING SUIT

3.1     On or about September 2, 2009, Barbara Fulbright, Individually and as Next Friend of Shamara Fulbright ("Fulbright"), filed suit against MGroup Holdings, Inc. ("MGroup"), Kings Crossing Apartments ("Kings Crossing"), Affordable Housing of Kingsville II, Ltd.

("Affordable"), Holcomb, Musemeche & Associates, Inc. ("Holcomb"), and Sally Reyes, alleging that Shamara Fulbright, an alleged tenant at Kings Crossing Apartments in Kingsville, Texas was raped on or about September 24, 2007, at the Kings Crossing Apartment Complex, located at 1505 E. Corral, Kingsville, Texas 78363. Capstone Real Estate Services, Inc. was added as a Defendant in a subsequently Amended Petition. Plaintiff in this underlying suit seeks damages for the injuries sustained by Fulbright as a result of the rape.

4. THE RELATIONSHIP OF THE PARTIES

4.1    Defendant Affordable owns the property commonly known as the Kings Crossing Apartments in Kingsville, Texas.

4.2    Defendant/Third-Party Plaintiff Capstone manages and operates the property known as the Kings Crossing Apartments in Kingsville, Texas.

4.3    Defendant/Third-Party Plaintiff Reyes is an employee acting in the role of Property Manager for the property commonly known as Kings Crossing Apartments in Kingsville, Texas.

4.4    Third-Party Defendant Sovereign is an Insurance Broker/Agent who sold a General Commercial Liability Insurance Policy to MGroup Holdings, Inc., covering the Kings Crossing Property.

4.5    Third-Party Defendant Jocelyn Chambless nee Hughes is an employee of Third-Party Defendant Sovereign, acting, at all times relevant to this suit, within the course and scope of her employment.

4.6    Plaintiff James River issued the General Commercial Liability Insurance Policy brokered by Third-Party Defendants covering the Kings Crossing property, and Defendant Steadfast Insurance Company ("Steadfast"), insures Defendant/Third-Party Plaintiff Capstone. Neither Plaintiff James River nor Defendant Steadfast is directly involved in this Third-Party Complaint.

## 5. FACTS

5.1    On or about July 21, 2005, Defendant/Third-Party Plaintiff Capstone entered into a Management Agreement with Defendant Affordable, wherein Capstone was engaged to manage and operate the Kings Crossing property.  Pursuant to this Management Agreement, Affordable was required to obtain a comprehensive general liability insurance policy naming Capstone as an additional insured.  Paragraph 4.01, *Property and Liability Insurance*, of the Management Agreement between Capstone and Affordable states:

> Owner's liability insurance must include a Comprehensive General Liability Policy written on an occurrence basis, including independent contracts, products, completed operations, and premises liability... [and] must have no exclusions or limitations with respect to coverage for assault and battery, sexual assault and molestation... [and] Manager shall be named as an additional insured on the Owner's required liability insurance.

A full and complete copy of the Management Agreement between Capstone and Affordable is attached hereto as Exhibit "A" and incorporated by reference as if fully set forth herein.

5.2    MGroup obtained a Commercial General Liability Policy from Third-Party Defendants Sovereign Insurance Group and Jocelyn Hughes covering Kings Crossing property for the policy term from October 1, 2006 through October 1, 2007.  This policy was in full force and effect for the period covering Fulbright's claims.  The insurer under this policy is James River Insurance Company ("James River").  A full and complete copy of this General Commercial Liability Insurance Policy is attached hereto as Exhibit "B" and incorporated by reference as if fully set forth herein.

5.3    At all times relevant to this suit, Third-Party Defendants Sovereign and Hughes represented to Defendant Affordable and Defendant/Third-Party Plaintiff Capstone that Capstone, and Capstone's employees, were named insureds under the General Commercial Liability Policy effective between October 1, 2006 and October 1, 2007.

5.4     Third-Party Defendants Sovereign and Hughes provided Affordable and Defendant/Third-Party Plaintiff Capstone with a "Certificate of Liability Insurance" indicating Capstone was a named insured under the policy issued by James River.  A full and complete copy of the Certificate of Liability Insurance is attached hereto as Exhibit "C" and incorporated by reference as if fully set forth herein.

5.5     At all times relevant to this suit, Third-Party Defendant Hughes was acting within the course and scope of her employment with Sovereign.

5.6     When Fulbright filed suit against naming Capstone and Reyes as Defendants, Defendants/Third-Party Plaintiffs Capstone and Reyes sought a defense and indemnification under the James River Insurance Policy.   James River denied coverage, alleging Defendants/Third-Party Plaintiffs Capstone and Reyes had not been added to the Policy as named insureds, as had been represented to Defendant Affordable and Defendants/Third-Party Plaintiffs Capstone and Reyes, by Third-Party Plaintiffs Sovereign and Hughes.

5.7     On December 2, 2011, the Court entered a Docket Control Order allowing the addition of new parties until March 2, 2012.  Further, Defendants/Third-Party Plaintiffs have filed a Motion for Leave to File Third Party Complaint with the Court prior to the March 2, 2012, deadline. Defendants/Third-Party Plaintiffs Capstone and Reyes now file this Third Party Complaint against Sovereign and Hughes pursuant to FRCP 14 and the Docket Control Order entered by this Court on December 2, 2011.

## 6. NEGLIGENT MISREPRESENTATION

6.1     Defendants/Third-Party Plaintiffs Capstone and Reyes incorporate the above by reference.

6.2    The information provided by Third-Party Defendants Sovereign and Hughes was incorrect in that Defendants/Third-Party Plaintiffs Capstone and Reyes were never added to the Affordable insurance policy.    The Third-Party Defendants violated the duty owed to the Defendants/Third-Party Plaintiffs by failing to exercise the reasonable care and competence of an insurance broker in ascertaining whether or not Capstone had been named as an insured under the Affordable policy.    The Third-Party Defendants supplied this information for the Defendant/Third-Party Plaintiffs' benefit and guidance in its transaction with Affordable, knowing in fact, that Defendant/Third Party Plaintiff would rely on it.  The Defendant/Third-Party Plaintiff reasonably and justifiably relied on the false information provided by the Third-Party Defendant and continued its relationship with Affordable under the Management Agreement.  The foregoing acts and omissions of the Third-Party Defendants, taken separately or collectively, constitute a direct and proximate cause of the Defendants/Third-Party Plaintiff's pecuniary loss set forth below.

## 7. DAMAGES

7.1    As  a  direct  and  proximate  result  of  the  Third-Party  Defendants'  negligent misrepresentations set forth above, and the Defendants/Third-Party Plaintiffs' justifiable reliance on that misrepresentation, Defendants/Third-Party Plaintiffs continued to operate under the Management Agreement between Capstone and Affordable under the notion that Capstone was an additional insured in the insurance policy issued by James River to Affordable. If Third-Party Defendants had exercised reasonable care and competence, the Defendants/Third-Party Plaintiffs would not have continued to operate as Managers of the Kings Crossing Apartments without taking additional steps to be named as insured under the James River Policy as required by the

Management Agreement between Affordable and Capstone.   Accordingly, Defendants/Third-Party Plaintiffs Capstone and Reyes hereby seek the following damages:

1.   Attorney's fees for the defense of Capstone and Reyes in the underlying suit initiated by Fulbright;

2.   Attorney's fees for the defense of Capstone and Reyes in the declaratory judgment action initiated by James River;

3.   Indemnification for Capstone and Reyes, in the unlikely event a judgment is ultimately rendered against Defendants/Third-Party Plaintiffs, collectively or individually, in the underlying suit;

4.   Indemnification for any attorney's fees assessed against Capstone and Reyes in the underlying suit initiated by Fulbright and in the declaratory judgment action initiated by James River.

### 8. CONCLUSION

8.1   Defendant/Third Party Plaintiffs would show that as a result of all of the above and foregoing, that they have been damaged in an amount being within the jurisdictional limits of this Court, and further that Third Party Defendants' negligence proximately cause Defendants/Third Party Plaintiffs' above and foregoing damages.

WHEREFORE, PREMISES CONSIDERED, Defendants/Third-Party Plaintiffs CAPSTONE REAL ESTATE SERVICES, INC. and SALLY REYES requests that Third-Party Defendant be cited to appear and answer herein, and that on final hearing of this cause, Defendants/Third-Party Plaintiffs have Judgment against Third-Party Defendants for an amount within the jurisdictional limits of this Court, for costs of suit, for interest on the Judgment, for pre-judgment interest, and for such other and further relief, in law or in equity, to which the Defendants/Third-Party Plaintiffs may show themselves justly entitled.

Dated: March 1, 2012

Respectfully submitted,

/s/ Harvey Ferguson Jr.

OF COUNSEL:

Thomas A. Cowen
Texas State Bar No. 04927600
Southern District Bar No. 10707
Email: tcowen@hfdlaw.com

Benjamin C. Nichols
Texas State Bar No. 04927600
Southern District Bar No. 30098
Email: bnichols@hfdlaw.com

**HOBLIT FERGUSON DARLING, LLP**
Bank of America Plaza
300 Convent Street, Suite 1450
San Antonio, Texas  78250
(210) 224-9991 (Telephone)
(210) 226-1544 (Facsimile)

Harvey Ferguson, Jr.
Attorney-in-Charge
Texas State Bar No. 06913500
Southern District Bar No. 8417
Email: hferguson@hfdlaw.com

**HOBLIT FERGUSON DARLING, LLP**
Bank of America Plaza
300 Convent Street, Suite 1450
San Antonio, Texas  78250
(210) 224-9991 (Telephone)
(210) 226-1544 (Facsimile)

**ATTORNEYS FOR DEFENDANTS CAPSTONE REAL ESTATE SERVICES, INC. AND SALLY REYES**

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served under the Federal Rules of Civil Procedure to the following counsel of record on March 1, 2012:

Ms. Beth D. Bradley
Mr. Stephen A. Melendi
Tollefson Bradley Ball & Mitchell, LLP
2811 McKinney Avenue, Suite 250
Dallas, Texas 75204
*ATTORNEYS FOR PLAINTIFF JAMES RIVER INSURANCE COMPANY*

Mr. Robert W. Musemeche
Law Office of Robert W. Musemeche
P.O. Box 203624
Austin, Texas 78720
*ATTORNEY FOR DEFENDANT AFFORDABLE HOUSING OF KINGSVILLE, II LTD.*

Mr. Jeffrey L. Hoffman
Mr. Ian R. Beliveaux
Henslee Schwartz, LLP
3200 Southwest Freeway, Suite 1200
Houston, Texas 77027
*ATTORNEYS FOR DEFENDANT STEADFAST INSURANCE COMPANY*

/s/ Harvey Ferguson Jr.

Harvey Ferguson, Jr.
Thomas A. Cowen
Benjamin C. Nichols

## MANAGEMENT AGREEMENT

THIS AGREEMENT by and between Affordable Housing of Kingsville II, Ltd. having its principal office at 1013 Van Buren, Houston, Texas 77019 ("Owner") and Capstone Real Estate Services, Inc., a Texas corporation, having its principal office at 210 Barton Springs Road, Suite 300, Austin, Texas 78704 ("Manager"):

### WITNESSETH:

WHEREAS, Owner owns and has the right to collect rents from, and contract for managerial services for, the property commonly known as King's Crossing Apartments located at 1505 E. Corral Kingsville TX 78363, Kleburg County ("Property"); and

WHEREAS, Owner desires to engage Manager to manage and operate the Property.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, Owner and Manager mutually agree as follows:

## ARTICLE 1. APPOINTMENT OF MANAGER

1.01    Appointment of Manager. Owner hereby appoints Manager and Manager accepts appointment as the sole and exclusive manager for the Property upon the terms and conditions set forth herein.

1.02    Legal Ownership. Owner represents and warrants to Manager that it is the legal owner of the real property described above and further represents and warrants to Manager that the Owner's Tax Identification Number is 05-0527598. Owner agrees to immediately advise Manager in writing of any change in ownership of the Property, or in the legal or assumed name of the Owner.

1.03    Term of Contract. The primary term of this contract shall be for a minimum term of twelve (12) months, commencing the 19th day of July 2005 ("Commencement Date") or until termination as provided in ARTICLE 5. Upon expiration of the primary term, this agreement will automatically renew every twelve months, until termination as provided in ARTICLE 5.

1.04    Independent Contractor Status. Manager is engaged in the business of managing properties as an independent contractor, and in that capacity, is serving as the property manager for the Property on behalf of Owner. The directors, officers, employees and agents of Manager shall have no personal liability arising from any action or omission of either party under this Agreement. Manager shall not be liable for any obligation or expenditure incurred on behalf of the Property or Owner within the scope of Manager's authority. In contracting for services and products giving rise to the Operating Obligations as defined in Section 2.07, Manager shall be acting solely as Owner's agent, and Owner agrees to indemnify, defend and save Manager, its principals, representatives and employees, harmless from and against all claims asserted and losses sustained by reason of such obligations. Manager may advise any contracting party with whom it deals that Manager is acting as Owner's agent, and that Manager shall have no liability for the obligation or expenditure, and may exact a commitment from the contracting party to look

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management Agreement_final.doc                                                                          REV 06/01

1

EXHIBIT

*A*

only to the Property or Owner for payment. Manager shall not be obligated to advance any sum of money for Owner or the Property, or lend its credit for the benefit of the Property.

1.05 Compliance with Building Regulations. Manager does not assume and is given no responsibility for compliance of any structure on the Property, or any equipment therein, with the requirements of any building codes or with any statute, ordinance, law or regulation of any governmental body or official thereof, except to notify Owner promptly of any complaints, warnings, notices or summonses received by it relating to such matters. Owner represents that to the best of Owner's knowledge the Property and all such equipment comply with all such legal requirements, and Owner authorizes Manager to disclose the ownership of the Property to any such officials and agrees to indemnify, defend and hold harmless Manager, its principals, representatives and employees, from and against all losses, costs, expenses, claims and liabilities whatsoever which may be imposed on, or asserted against, them by reason of any past, present or future violation, or alleged violation, of such laws, ordinances, statutes or regulations.

1.06 Manager Assumes No Liability. (a) Manager assumes no liability whatsoever for any acts or omissions of Owner, or any previous or subsequent owners or managers of the Property, or any agents or any previous or subsequent agents of either. Manager assumes no liability for the failure to perform any duty under this Agreement in the event the Owner does not provide sufficient funds for such purpose. Manager assumes no liability for any failure of, or default by, any tenant in the payment of any rent or other charges due Owner or in the performance of any obligations owed by any tenant to Owner pursuant to any lease or otherwise. Manager assumes no responsibility for the maintenance of the market value of the Property and assumes no liability for a decrease in the market value of the Property.

(b) Manager assumes no liability for any failure of, or default by, any potential purchaser of the Property. In the event Manager provides assistance or information intended to assist in any transaction involving the sale or refinancing of the Property, Owner will hold Manager harmless from claims based upon the inaccuracy of such assistance or information. Manager assumes no liability for any failure of, or default by, any potential purchaser of the Property.

(c) Manager assumes no liability for violations of environmental or other building regulations other than to promptly notify Owner of violations or hazards discovered. Owner recognizes that Manager is not an expert with respect to the detection, control, handling or removal of toxic wastes, hazardous materials or undesirable substances of any kind, including but not limited to minerals, chemicals, hydrocarbons, molds, biological or radioactive items ("Hazardous Materials"). Owner acknowledges that such Hazardous Materials are, or in the future, may become the subject of local, state or federal laws and/or regulations requiring special handling, control or removal. Owner shall retain such Hazardous Materials and legal experts as are necessary to determine the nature and extent of any Hazardous Materials on the property as well as the steps that may be prudent or appropriate to handle, control or remove such Hazardous Materials. Manager shall have no responsibilities with respect to such Hazardous Materials and Owner agrees to defend, indemnify and hold Manager harmless from and against any and all claims, demands, damages, liabilities, costs and expenses, including but not limited to court costs and experts' and attorneys' fees arising out of or in any way related to Hazardous Materials on the property or any actions taken by Manager with respect to such materials. Owner shall disclose in writing to Manager, tenants, purchasers, and prospective tenants and purchasers the existence and complete contents of any and all reports known to Owner regarding Hazardous

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management Agreement_final.doc                                                                                    REV 06/01

2

Materials as well as the possibility known to Owner of the potential for or any other information regarding Hazardous Materials on or near the property. In the event that the property contains or may contain any Hazardous Material, Manager reserves the right at any time to terminate this Agreement upon notice to Owner.

(d)     Manager's on-site employees are not trained security personnel and Manager assumes no responsibility or liability for the provision of security services or devices. In the event that Owner authorizes or requires Manager to engage security services or install/change security devices at the Property, Owner shall indemnify, defend and hold harmless Manager, its principals and employees from and against any and all losses, costs, expenses, claims and liabilities, arising out of the provision of any security services or any security devices at the Property.

## ARTICLE 2.  MANAGER'S DUTIES AND RESPONSIBILITIES

2.01    Proposed Management Plans.    Within ninety (90) days following the Commencement Date of this Agreement, Manager shall prepare and submit to Owner a proposed "Marketing Plan", "Operating Budget", and "Capital Budget" for the promotion, operation, repair and maintenance of the Property for Owner's fiscal period ending December 31, 2005 (collectively, the "Management Plans").  Subsequent proposed Management Plans shall be submitted to Owner forty-five (45) days prior to the beginning of the next fiscal year. Manager makes no guaranty, warranty, or representation whatsoever in connection with the accuracy of the Management Plans, and Owner agrees that the Management Plans are intended as good faith estimates only.

Owner will review the proposed Management Plans and will consult with the Manager prior to the commencement of the forthcoming fiscal year in order to agree on an "Approved Marketing Plan", "Approved Operating Budget", and "Approved Capital Budget".    All Management Plans submitted to Owner for review will be considered "Accepted and Approved" if there has been no specific written objection thereto from Owner within thirty (30) days from the date they were respectively submitted.

2.02    Approved Marketing Plan.  The Approved Marketing Plan shall constitute an authorization for Manager to establish rental rates and implement marketing strategies subject to the Approved Operating Budget.  Manager shall supervise the preparation of all advertising layouts, brochures, campaigns, and model apartments.  Advertising and promotional materials shall be prepared in full compliance with Federal, State, and Municipal fair housing laws, and Manager shall not use Owner's name in such advertising literature without Owner's express written approval.

2.03    Leasing.  Manager shall exercise reasonable efforts to obtain and keep tenants and will cooperate with licensed brokers in reasonable manner to aid in filling any vacancy.  Leases will be executed in the name of the Property (and may identify Owner) and Owner shall maintain a current "Assumed Name" certificate on file in the county where the Property is located. (a) If Property is a residential project, Manager is authorized, subject to the Approved Marketing Plan, to negotiate, prepare, and execute all leases, including all renewals and extensions of leases and to cancel and modify existing leases. The standard lease form, attached as Exhibit 1, shall be used with such modifications as Manager shall reasonably approve. (b) If Property is a non-

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management Agreement_final.doc                                                                                                    REV 06/01

3

residential project, leasing will be performed in accordance with the attached Exclusive Leasing Agreement.

2.04    Security Deposits.  Manager is authorized to establish requirements for security deposits, in accordance with the Approved Marketing Plan, and shall collect and refund security deposits in accordance with laws and the terms of each tenant's lease.  If required by statute, Manager will deposit security deposits into a separate interest bearing account and pay tenants the interest earned on such deposit; otherwise, Manager will deposit security deposits into the Operating Account.  When Manager deems appropriate, Manager may offset tenant charges with forfeited security deposit amounts and disburse any surplus security deposits from the Operating Account.

2.05    Operating Account.  Owner authorizes Manager to open a demand deposit account ("Operating Account") at a national banking institution ("Bank") located conveniently to the Property.  The Operating Account shall be a non-interest bearing checking account.

Manager shall act as the paying agent for Owner and, in the conduct of its business related to the Property, shall have the right to withdraw funds from the Operating Account. Owner shall rely exclusively on Manager to receive all correspondence and statements of information with respect to the Operating Account and Bank will direct such correspondence and statements to Manager.

During any period that Property funds are deposited into a demand deposit account established under Manager's Tax Identification Number, Owner acknowledges that any unclaimed funds resulting from outstanding checks will be retained by Manager as required for compliance with state unclaimed and abandoned statutes.  Manager shall transmit to the Internal Revenue Service appropriate Statements for Recipients of Miscellaneous Income for payments made from all demand deposit accounts and Manager shall sign the transmittal on behalf of Owner.  Further, Manager has the authority, conferred on it by Owner, to request the Tax Identification Numbers of recipients or others for whom information is being reported.

2.06    Collection of Rents and Enforcement of Leases.  Manager shall exercise reasonable efforts to promptly collect all rents and other charges for services provided in connection with the use or occupancy of the Property.  All monies collected shall be promptly deposited in the Operating Account.  When necessary and without limitation, Manager is authorized to institute the following actions: (i) terminate tenancies, (ii) sign and serve such notices as are deemed necessary by Manager, (iii) institute and prosecute actions to evict tenants, and recover rents and other sums due and (iv) settle, compromise and release such actions or suits or reinstate such tenancies.  Attorney's fees, filing fees, court costs, and other reasonable expenses incurred in connection with such actions and not recovered from tenants shall be paid out of the Operating Account.  Manager may select the attorney of its choice to handle such litigation.

2.07    Approved Operating Obligations.  The term "Operating Obligations" shall mean the aggregate of all obligations incurred by Manager, or any agent on its behalf, in connection with or arising from the ownership, operation, management, repair, replacement, maintenance, and use or occupancy of the Property including without limitation expenditures for any of the following: (i) license and permit fees, landowner association fees, real estate and personal property taxes and assessments, and all other charges of any kind and nature by any

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management
Agreement_final.doc                                                                                            REV 06/01

4

governmental or public authority; (ii) management fees and reimbursable expenses incurred by Manager; (iii) advertising and marketing expenses, and leasing fees and commissions; (iv) legal, accounting, engineering, and other professional and consulting fees and disbursements; (v) accounts payable to contractors and vendors providing labor, material, services and equipment to the Property; (vi) premiums for insurance paid with respect to the Property or the operations thereof; (vii) tenant improvements and property and equipment maintenance, repairs and replacements (including property used in connection with the Property) and segregated reserves therefor; (viii) refunds of security or other deposits to tenants and contracting parties; (ix) funds reserved for contingent or contested liabilities, insurance premiums, and other amounts not payable on a monthly basis; (x) service contracts and public utility charges and assessments; (xi) personnel administration charges and pre-employment screening and testing costs; (xii) on-site payroll costs including salary and wages, incentive bonuses, holiday and vacation pay, insurance benefits, pension and health and welfare payments, payroll taxes and other governmental assessments, and; (xiii) costs of credit reports, bank charges and like matters. The payment of Operating Obligations shall constitute ("Operating Expenditures") and shall be made from the Operating Account.

2.08    Approved Operating Budget. The Approved Operating Budget shall constitute an authorization for Manager to expend the amounts approved. Manager shall exercise reasonable efforts to insure that the actual costs of maintaining and operating the Property shall not exceed the Approved Operating Budget and significant year-to-date budget variances will be explained to Owner each month.

In cases of emergency, Manager may make expenditures for repairs which exceed the aforementioned spending limit without prior approval, if it is necessary in the reasonable judgement of Manager, to prevent damage to property or injury to person.   Manager will promptly notify Owner of any such emergency expenditures.

2.09    Approved Capital Budget The Approved Capital Budget shall constitute an authorization for Manager to expend the amounts approved for capital acquisitions and improvements; however, any capital expenditure over $1,500.00 shall be awarded on the basis of competitive bidding, solicited in the following manner:

(i)     A minimum of three (3) written bids shall be obtained for each purchase where practicable.

(ii)    Each bid will be solicited in a form so that, to the extent feasible, uniformity will exist in the bid quotes.

(iii)   Manager shall provide Owner with all written bid responses accompanied by manager's recommendations as to the most acceptable bid.

(iv)    Owner shall be free to accept or reject any and all bids.

Owner shall communicate to Manager its acceptance or rejection of bids in writing. Owner shall be responsible for capital expenses, and may pay same from its own resources or may authorize payment by Manager out of available surplus funds in the Operating Account.

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management
Agreement_final.doc                                                                                          REV 06/01

5

2.10    Public Utility and Service Contracts.    Manager shall negotiate and execute, on behalf of and in the name of Owner, contracts for water, electricity, gas, telephone, television, vermin or pest extermination, and any other services which are, in Manager's opinion, reasonably necessary to properly serve and maintain the Property. All required utility deposits will be the responsibility of the Owner. Each service contract shall: (i) include a provision for cancellation thereof by Owner or Manager upon not more than 30 days written notice, and (ii) be subject to bid under the procedure as specified in Section 2.09 if recurring requiring monthly payments in excess of $1,500.00 except for public utilities.

2.11    Manager's On-Site Employees.    Owner acknowledges that Manager is an Equal Opportunity Employer and that Manager must abide by all Fair Housing laws, statutes, ordinances and regulations. Owner shall not request or require Manager to do anything contrary to, or incontravention of, any Equal Opportunity or Fair Housing law, statute, ordinance, or regulation. Owner specifically acknowledges and agrees that the indemnity provisions of Section 4.04 hereof shall include any and all employment and/or discrimination claims that may be asserted against Manager. Manager is authorized to screen, test, investigate, interview, hire, supervise, discharge, and pay all personnel necessary to maintain and operate the Property, subject to this Agreement and the Approved Operating Budget. Such personnel shall in every instance be employees of Manager and Owner shall have no right to supervise or direct such employees. Notwithstanding the foregoing, if the Owner alters any instructions or direction given to Manager's employees by Manager, or if the Owner assumes any supervision of Manager's employees, then Owner shall be solely liable and responsible for any consequences of such action. Manager shall be paid from the Operating Account for all payroll related costs pursuant to attached Schedule B.

2.12    Debt Service and Tax Payments.    If requested by Owner in writing and if sufficient funds are available in the Operating Account to satisfy all outstanding (and reasonably anticipated) Operating Obligations of the Property, Manager will apply any surplus operating funds to pay (to the extent of such surplus funds) the debt service and taxes due pursuant to any Federal, State, County or Municipal authority, or other similar body having jurisdiction thereover. Manager, however, shall not take any action under this Section 2.12 so long as Manager has been notified in writing that Owner is contesting, or intends to contest, any such order or requirement. Owner will supply all information necessary for Manager to comply promptly with these requirements.

2.13    Financial Recordkeeping.    Manager shall maintain, at Manager's premises, accounting records based on the Owner's fiscal year-end set forth in Section 2.01. Manager shall use its own chart of accounts and monthly financial statements will be cut-off approximately ten (10) days prior to month-end. It is understood that expense entries on the reports delivered to Owner will appear only as to expenditures for which Manager has received and processed invoices, and that as of the date of the report, other valid charges against the Property may be outstanding but not yet processed by Manager in the ordinary course of its business.

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management Agreement_final.doc                                                                REV 06/01

6

2.14    Financial Reports.    Manager shall furnish monthly reports of collections, disbursements, and other accounting matters. These reports will be sent to Owner not later than the 10th of each month. To support the monthly financial reports, Manager shall maintain at Manager's premises copies of the following:

(i)     Bank statements, bank deposit slips and canceled checks.

(ii)    Comprehensive bank reconciliations.

(iii)   Detailed cash receipts records.

(iv)    Summaries of adjusting journal entries.

(v)     Supporting documentation for payroll, payroll taxes and employee benefits.

2.15    Distribution of Net Operating Income.    If requested by Owner in writing, Manager shall remit to Owner with the monthly financial report all unexpended operating funds except for a reserve for contingencies which shall remain in the Operating Account in accordance with Section 3.01.

2.16    Owner's Right to Audit.    Owner reserves the right to conduct examination of the books and records maintained by Manager for Owner, and to perform any and all audit tests relating to Manager's activities, either at the Property, or at any office of the Manager; provided such examination and tests are related to those activities performed by Manager for Owner. Any and all such audits conducted either by Owner's employees or appointees will be at the sole expense of Owner.

2.17    Monitoring and Compliance.    Schedule C attached hereto, is incorporated and made part of this Agreement.

<u>ARTICLE 3.  OWNER'S DUTIES AND RESPONSIBILITIES</u>

3.01    Initial Deposit and Contingency Reserves.    Immediately upon commencement of this Agreement, Owner shall remit to Manager the sum of $7,000.00 to be deposited in the Operating Account as an initial deposit representing the estimated disbursements to be made in the first month following the commencement of this Agreement. Furthermore, Owner authorizes Manager to maintain a contingency reserve of $7,000.00 at all times in the Operating Account to enable Manager to pay the Operating Obligations of the Property under this Agreement as they become due.

3.02    Insufficient Operating Funds.    If, as a result of Management Plans, a cash flow deficit can be anticipated in the next budgeted month of operations, Owner agrees to remit to Manager, prior to the commencement of the next budgeted month, sufficient funds to cover the anticipated deficiency and fully fund the approved contingency reserves. In the event that funds in the Operating Account become insufficient to cover all Operating Obligations and approved contingency reserves, Owner agrees to, within five (5) days after notice, remit to Manager sufficient funds to cover the deficiency and replenish the contingency reserves. Manager shall

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management
Agreement_final.doc                                                                                    REV 06/01

7

not be obligated to advance its own funds on behalf of the Owner, or incur any liability in its own name.

3.03     Manager's Compensation.  Owner agrees to pay Manager for services rendered in managing and leasing the Property in accordance with the terms of this Agreement the fees specified in the attached Schedule A.  Manager's compensation shall be paid from the Operating Account or if necessary, funded by Owner under Section 3.02 above.

3.04     Property Expenses Paid on Behalf of Owner.  Owner agrees to pay Manager for property related expenses, paid by Manager on Owner's behalf, as specified in the attached Schedule B.  Manager shall be paid from the Operating Account, or if necessary, funded by Owner pursuant to Section 3.02 above.

### ARTICLE 4.  INSURANCE AND INDEMNIFICATION

4.01     Property and Liability Insurance.  Owner shall keep in force, at all times, adequate insurance written on a Special Causes of Loss Form to protect Owner and Manager against physical damage (e.g., fire with extended coverage endorsement, boiler and machinery, etc.) to the Property and against liability for loss, damage, or injury to property or persons which might arise out of the use, occupancy, management, operation or maintenance of the Property.  It is recommended that Owner's property insurance be written on a full replacement cost basis with deletion of any coinsurance clauses, and include business interruption coverage with extended period of indemnity and flood coverage, where applicable. Any deductible required under such insurance policies shall be Owner's expense.

Owner's liability insurance must include a Comprehensive General Liability Policy written on an occurrence basis, including independent contractors, products, completed operations, and premises liability, and a broad form endorsement including blanket contractual liability and personal injury liability with combined single limits of not less than $1,000,000 each occurrence/$2,000,000 aggregate.   Owner's liability insurance must have no exclusions or limitations with respect to coverage for assault and battery, sexual assault and molestation, swimming pools, and smoke detectors.     In addition, the Owner shall carry an excess liability (umbrella) insurance policy with bodily injury and property damage combined single limits of not less than $10,000,000.  Manager shall be named as an additional insured on the Owner's required liability insurance.

*Illegible handwritten margin note: "blus $4,000,000 min"*

Owner's insurance policies shall be written by solvent and reputable carriers, approved to do business in the Property's State of operation with a minimum Best rating of A-VII at all times, and Owner shall furnish Manager with certificates evidencing such insurance concurrent with the execution of this Agreement.  The certificates evidencing insurance shall have attached thereto an endorsement to the actual policy that Manager shall be given at least thirty (30) days written notice (by certified mail) prior to cancellation, non-renewal, or any material change in the subject policy.

Owner's liability insurance policies shall be deemed to be primary, not in excess of, and non-contributory, with respect to any general liability insurance carried by Manager, while Manager is acting within the scope of this agreement, and shall provide for the payment of all costs of defense of any claims.  Manager may elect to maintain additional separate insurance to cover its own risks, and in such event, such insurance shall not be available to cover risks of loss or claims made against the Property or Owner.

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management Agreement_final.doc                                                                                                    REV 06/01

8

4.02     Master Insurance Program. Manager has arranged, through its insurance agent, a master insurance program in which Owners of property managed by Manager may participate. If Owner elects to participate in the master insurance program, then Owner may acquire insurance coverage's under the master insurance program through Manager's Agent, in which case, Owner shall pay the amount provided on the insurance invoice delivered to Owner. Owner acknowledges that the amounts payable by Owner under the master insurance program may include administrative charges payable to Capstone Member Services, LLC which are in excess of the actual insurance premiums charged by the underlying insurance carriers. Owner acknowledges that Manager is not an expert or consultant regarding insurance coverage's and requirements; accordingly, Owner assumes all risks with respect to the adequacy of insurance coverage's whether such insurance is provided under the master insurance program or otherwise, and Manager shall have no liability therefore in any respect.

4.03     Workers' Compensation Insurance. Manager shall, at Owner's expense pursuant to the attached Schedule B, maintain workers' compensation insurance (or a substitute form of coverage providing approximately equivalent protection) covering all employees of Manager employed on the Property so as to provide benefits required by state and federal laws.

4.04     Fidelity Insurance.         Manager will maintain at Manager's expense, a comprehensive fidelity insurance policy to include depositors forgery in amounts of not less than $500,000 per employee. Upon request, Manager will furnish a certificate of insurance to Owner evidencing coverage.

4.05     Indemnification         (a) It is the Owner's and Manager's intent to look first to the Owner's liability insurance required pursuant to Section 4.01 (the "Required Insurance") for the payment of all applicable losses, damages, expenses, judgments, settlements, and defense costs, including all reasonable attorneys fees, witness fees, costs of investigation and court costs (all of the foregoing are hereinafter collectively referred to as "Costs") arising in connection with any claim or allegation asserted with regard to the Property (hereinafter collectively, a "Claim"), without regard to the following indemnities. Therefore, notwithstanding any indemnity language to the contrary in paragraphs (b) and (c) below, the Required Insurance shall take precedence over the following indemnities and, in the event a Claim arises which is covered by the Required Insurance, Owner shall cause all Costs associated with the Claim to be paid in accordance with the Required Insurance, and to the extent of such payment the indemnities set forth below shall not apply. To the extent a Claim is either not covered or the Costs of a covered claim are not fully paid by the Required Insurance, the parties agree that the indemnities set forth below shall apply. As to any Claims paid by the Required Insurance, the parties agree to waive all rights of subrogation, provided that such waiver does not invalidate any insurance policy, or materially increase the premium rates for such insurance.

(b)  Subject to paragraph (c) below, Owner shall defend, indemnify and hold harmless Manager, its principals, agents, and employees (collectively, "Operator") from and against all Costs incurred by Operator, in excess of amounts paid under the Required Insurance, as a result of any act, omission, or allegation thereof, giving rise to a Claim including, without limitation, allegations of negligence on the part of Owner or Operator, and any alleged violation of any law, regulation or ordinance (collectively, "Laws"), including Laws pertaining to fair employment, fair credit reporting, environmental protection, rent control, taxes, or fair housing (including, but not limited to Laws prohibiting discrimination on the basis of race, sex, sexual orientation, creed,

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management
Agreement_final.doc                                                                                    REV 06/01

9

color, religion, national origin or mental or physical handicap) which act or omission is allegedly committed (i) by Owner, or (ii) by Operator; and with respect to this indemnity, Owner shall pay as incurred all Costs in excess of payments received from the Required Insurance.

(c)  Manager shall indemnify and hold harmless Owner from and against all Costs incurred by Owner, in excess of amounts paid under the Required Insurance, as a result of any act, or failure to act, by Manager giving rise to Claim, if Manager is finally adjudged by a court of competent jurisdiction to have acted through its own employees, performing their duties within the course and scope of their employment, in a manner constituting gross negligence or willful misconduct, and in such event Manager shall not be entitled to receive indemnity under paragraph (b) and shall promptly reimburse Owner for all Costs that Owner may previously have advanced on behalf of Manager in connection with such Claim.

## ARTICLE 5.  TERMINATION

5.01    Immediate Termination.  (a)  This Agreement may be terminated immediately by Owner, for Manager's gross negligence or willful misconduct provided that such notice is accompanied by payment to Manager of all fees then accrued, plus complete reimbursement of Manager's costs as specified in the attached Schedule B.

(b)  Manager may terminate this contract immediately if Owner fails to cure a deficiency or restore a contingency in the Operating Account as required by Section 3.02 or if Owner fails to pay the fees due to Manager, or fails to comply with each of its other obligations under this Agreement.

5.02    Termination by 30-Day Notice.  Either party may terminate this Agreement, without cause, by giving the other party at least thirty (30) days notice in writing.  Such notice shall not affect or impair any right which has accrued to either party prior to the date of termination.

5.03    Termination on Sale.  This Agreement will terminate upon the sale, destruction, seizure by eminent domain or foreclosure of the Property or upon termination of the Owner's right to possession of or right to collect and retain the rents from the Property.

5.04    Owner Responsible for Payments.  Owner will be responsible for the direct handling and payment of invoices received after notice of termination, provided that to the extent of available operating funds in the Operating Account, Manager may, but shall not be required to do so, continue to pay obligations incurred by the Property through the termination date including Manager's fees and reimbursements.  Upon notice of termination, Manager will submit to Owner an estimate of the additional funds required to pay all Operating Obligations incurred by the Property through the termination date.  Owner will promptly remit all additional funds required by such estimate, and Manager will not be obligated to advance its own funds for payment of obligations incurred on behalf of the Property or Owner.

5.05    Final Accounting.  Within sixty (60) days after termination, Manager shall deliver to Owner:

(i)     A final accounting, reflecting the balance of income and expenses pertaining to the Property as of the date of termination.

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management Agreement_final.doc                                                                        REV 06/01

10

    (ii)    All remaining funds held by Manager with respect to the Property after payment of the obligations referred to in Section 5.04.

    5.06    Manager's Retention of Copies.  Upon termination, Manager shall deliver to Owner all records, contracts, leases and other papers or documents in Manager's custody or control necessary to the management of the Property.

    Manager shall be entitled to retain copies of or have reasonable access, upon request, to all documents and papers delivered to Owner.

    5.07    No Waiver of Rights.  No termination of this Agreement shall operate, however, to waive, diminish or impair any right that has accrued to either party to the date of termination, nor shall any such termination impair either party's right to indemnity under this Agreement.

ARTICLE 6. NOTICES, ETC.

    6.01    Notices.  All notices provided for in this Agreement shall be in writing and shall be given to Owner or Manager at the address set forth below or at such other address as they individually may specify thereafter by written notice in accordance herewith:

|  |  |  |
|---|---|---|
|  | if to OWNER: | Affordable Housing |
| of Kingsville II, Ltd. | 1013 Van Buren | |
|  | Houston, TX 77019 | |
| ATTN: | Mark Musemeche | |
| TITLE: | Vice President | |
| if to MANAGER: | Capstone Real Estate Services, Inc. | |
|  | 210 Barton Springs Road, Suite 300 | |
|  | Austin, Texas 78704 | |
|  | Mailing Address: | |
|  | P.O. Box 760 | |
|  | Austin, Texas 78767 | |
| ATTN: | Mike Gettman | |
| TITLE: | Corporate Secretary | |

Such notices shall be deemed effective upon actual delivery, or if mailed, certified return receipt requested, postage prepaid, properly addressed, three (3) days after posting.

    6.02    Consents and Approvals.  All consents and approvals and waivers required or asserted hereunder shall be in writing, signed by the party against whom such consent, approval, waiver or notice is urged, provided that no written consent or approval of Owner or its representative shall be required for any action that Manager may, in its reasonable discretion, find it necessary to take in the event of an emergency. Owner designates the person(s) listed in Section 6.01 as the person(s) from whom any consents or approvals required hereunder may be obtained. Owner further agrees to give Manager notice of any change in the designation,

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management
Agreement_final.doc        REV 06/01

11

provided that Owner shall at all times designate at least one person from whom consents or approvals required hereunder may be obtained, and shall furnish to Manager current information concerning the address and telephone number at which such person may be contacted at all times. Until Manager has received actual notice of such change, Manager shall be entitled to rely on any consents or approvals given by the previously designated person in connection with any matters hereunder.

6.03    Cooperation.  Owner will keep Manager advised of its complete name at all times, including any change of such name. Owner and Manager will cooperate to facilitate and promote the mutual objectives of managing the Property.

6.04    No Assignment.  This Agreement and all rights hereunder shall not be assignable unless agreed to by both parties except (a) as may be required by a surety company in a matter of subrogation, or (b) that the right to receive payment, but not the duties hereunder may be assigned by Manager subject to Manager's performance of its duties under this Agreement.

6.05    Pronouns.  Where appropriate to the context, words of one gender include all genders, and the singular includes the plural and vice versa.

6.06    Amendments.    This Agreement may not be modified except in a written instrument signed by the parties.

6.07    Representations.  Manager represents and warrants that it is fully qualified and licensed, to the extent required by law, to manage real estate and perform all obligations assumed by Manager hereunder.  Manager agrees to comply with all such laws now or hereafter in effect. Manager has made no representations to Owner except as are set forth herein.

6.08    Complete Agreement.  This Agreement together with all schedules attached hereto and made part thereof, supersedes all previous agreements, understandings and representations made by or between the parties hereto.

6.09    Governing Law.  The parties acknowledge that Manager maintains its principal place of business and offices in Austin, Texas, and that all decisions of Manager with regard to the Property will be subject to review from Austin, Texas.  This Agreement shall therefore be governed by and construed in accordance with the laws of the State of Texas, and the parties agree that in the event of a dispute relating to the terms of this agreement or their relationship, the state and federal courts situated in Travis County, Texas shall be the exclusive forum for the adjudication of such dispute and each of the parties hereby submits to the personal jurisdiction of such courts for that purpose.

6.10    Legal Construction.  In case any one or more of the provisions contained in this Agreement shall for any reason be held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalid provision shall be deemed severable, and shall not affect the validity or enforceability of any other provisions of this Agreement, all of which shall remain fully enforceable.

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management
Agreement_final.doc                                                                                              REV 06/01

12

KING'S CROSSING APARTMENTS

6.11 <u>Captions.</u> The captions used in this Agreement are solely for convenience, and shall not be deemed to constitute a part of the substance of the Agreement for purpose of its construction.

IN WITNESS WHEREOF the parties have executed this Agreement as of the 21st day of July, 2005.

OWNER: Affordable Housing of Kingsville II, Ltd.

By: Texas Housing Associates, Inc., General Partner

By: _____

Address: 1013 Van Buren
Houston, TX 77019

Print Name: Mark Musemeche

Title: Vice President

Date: 7.18.05

MANAGER: CAPSTONE REAL ESTATE SERVICES, INC.

Address: 210 Barton Springs Road
Suite 300
Austin, Texas 78704

By: _____

Print Name: Matthew C. Lutz

Mailing Address:
P.O. Box 760
Austin, Texas 78767

Title: Executive Vice President

Date: 7/15/05

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management Agreement_final.doc REV 06/01

13

KING'S CROSSING APARTMENTS

## SCHEDULE A

## MANAGER'S COMPENSATION

1.      Management Fee.  Manager's compensation for management of the Property shall begin on August 18, 2005 and shall be a fee of  4.5 % of the gross monthly income.  The fee will be calculated at the end of each accounting period and will be considered an expense attributable to that period.  Upon the commencement or termination of this Agreement, the fee shall be prorated on a per diem basis using the gross income for the last complete month of operation.

2.      Subcontractor Supervision Fee.   Manager's compensation for soliciting and obtaining bids and supervision and coordination of subcontractors providing restoration services due to fire, flood, hurricane, tornado, or other like occurrences and major capital improvement projects, including but not limited to, roof repair or replacement; major HVAC repair or replacement; major electrical system repair or replacement; and major parking lot and/or landscape improvement or repair, shall be equal to 10% of gross restoration expenditures, including fees of architects and engineers.

3.      Additional Services.  In consideration for any additional services other than the services required under this Agreement, and with Owner's prior approval, Manager's time will be billed at $90.00 per hour.

Initials

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management Agreement_final.doc                                                                                                      REV 06/01

14

KING'S CROSSING APARTMENTS

## SCHEDULE B

### PROPERTY EXPENSES TO BE FUNDED BY OWNER
### TEXAS - RESIDENTIAL

1.      Direct payroll costs of employees assigned on-site duties:

      A.      Regular, overtime, and holiday pay
      B.      Incentive bonuses and leasing commissions
      C.      Annual leave time (vacation and illness) allowed by Manager's employment policy

2.      Statutory payroll taxes and related personnel costs of employees assigned on-site duties, which are calculated based on the total payroll per pay period and which are subject to periodic change:

| | | |
|---|---|---:|
| A. | Group Life and Major Medical ($2.14/Payroll Hour) | |
| B. | Social Security (FICA) | 6.20% |
| C. | Medicare | 1.45% |
| D. | State Unemployment Taxes | 3.63% |
| E. | Federal Unemployment Taxes | .80% |
| F. | Employee Health and Safety Program | 7.12% |
| | **TOTAL:** | 19.20% |

3.      Personnel administration costs of employees assigned on-site duties which are calculated based on the total payroll per pay period times 5.50%:

      • Hiring Administration
      • Personnel file maintenance
      • Preparation of quarterly and annual IRS reports
      • Payroll service bureau data processing costs
      • Unemployment claims administration
      • Group medical claims administration

4.      Where applicable, sales taxes will be charged on services performed by on-site personnel and reimbursed through payroll costs.

5.      Cost of providing resident rent bills; vendor checks, envelopes and postage; and other materials supplied by the Manager as required for operation of the Property and billed at one dollar ($1.00) per unit per month.

6.      Direct expenses of the Manager such as photocopying expenses, special handling postage, and long-distance phone charges.

Initials     _____

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management
Agreement_final.doc      REV 06/01

15

KING'S CROSSING APARTMENTS

## SCHEDULE C
## MONITORING AND COMPLIANCE PROCEDURES

Tax Credit Compliance.   Manager acknowledges that compliance with IRC Section 42 and other applicable state and federal tax credit provision are critical to Owner obtaining tax credits under the LIHTC program.   Accordingly, Manager shall exercise its reasonable best efforts to the following steps:

(A)   Properly train and supervise all staff members of the Manager regarding the leasing regulations of the Low Income Housing Tax Credit (LIHTC) program.

(B)   At Owner's direction and expense, engage a certified public accountant knowledgeable in the LIHTC program to adjust the accounting books and prepare all federal income tax returns.

(C)   Maintain in the Property management and leasing office the maximum tenant income guidelines and the maximum rents which can be charged.   Also, maintain in the management office the compliance handbook and the current utility allowance schedule published by the local housing authority.

(D)   Assist staff members of the appropriate governing agency in monitoring compliance with the provisions in IRC Section 42.   The Manager shall promptly file all required reports with the such agency, and assist staff members of the agency in on-site inspections and audits.

(E)   Interview and qualify prospective tenants in accordance with the tenant income eligibility requirements of the low-income housing tax credit law. Manager shall review credit reports, prior landlord references, verify and certify tenant income and/or employment, notify tenant of acceptance or rejection.

(F)   Obtain an annual income certification of income for each low-income qualified tenant on a tenant certification form.

(G)   Obtain third-party income verification to support each tenant certification form.

(H)   Obtain additional records for each building in managing the Property which show the total number of residential rental units in the building, the percentage of residential rental units in the building that are low-income units, the rent and utility allowances charged for each low-income unit, the number of occupants in each low-income unit, and the low-income unit vacancies in each building and information that shows when, and to whom, the next available units were rented.

(I)   Retain all records of the Property required in compliance with IRC Section 42 for at least six years after the due date (with extensions) for filing the federal income tax return for that year. However, records for the first year of the tax credit period must be retained for at least six years beyond the due date (with extensions) for filing the federal income tax return for the last year in the compliance period of the building.

(J)   Make reasonable best efforts to comply with all monitoring requirements of the Internal Revenue Service as published in Regulations 1.42-5.

Initials _____                                    _mell_

K:\Marketing\_Properties\Proposed\2005\Mark Musemeche\Agreements\King's Crossing\King's Crossing Management
Agreement_final.doc                                                                    REV 06/01

16

## Attached to and Forming Part of Policy No.
## 00012262-1

"THIS INSURANCE CONTRACT IS WITH AN INSURER NOT LICENSED TO TRANSACT INSURANCE IN THIS
STATE AND IS ISSUED AND DELIVERED AS A SURPLUS LINE COVERAGE PURSUANT TO THE TEXAS
INSURANCE STATUTES. THE TEXAS DEPARTMENT OF INSURANCE DOES NOT AUDIT THE FINANCES OR
REVIEW THE SOLVENCY OF THE SURPLUS LINES INSURER PROVIDING THIS COVERAGE, AND THIS
INSURER IS NOT A MEMBER OF THE PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION
CREATED UNDER ARTICLE 21.28-C, INSURANCE CODE.  ARTICLE 1.14-2, INSURANCE CODE, REQUIRES
PAYMENT OF 4.85 PERCENT TAX ON GROSS PREMIUM."

| | |
|---|---|
| Insured: | MGroup Holdings, Inc. |
| Policy Term: | 10/01/2006 to 10/01/2007 |
| Agent: | Sovereign Insurance Group<br>Jocelyn Hughes<br>14860 Montfort Drive<br>Suite 111<br>Dallas, TX 75254 |
| Insurer: | James River Insurance Company |

It is agreed the premium declarations is amended as follows:

| | | |
|---|---|---:|
| PREMIUM: | | $36,490.00 |
| Inspection Fee | | $250.00 |
| Policy Fee - Our Office | | $250.00 |
| Surplus Lines Tax | Tax Rate 4.85% For TX | $1794.02 |
| Stamping Fee | Tax Rate 0.1% For TX | $36.99 |
| | **Total:** | $38,821.01 |

Surplus Lines Agent:  Colemont Insurance Brokers of Texas LP
5910 North Central Expressway, Suite 500
Dallas, Texas 75206



EXHIBIT

B

tabbies

# TEXAS NOTICE

**IMPORTANT NOTICE**

To obtain information or make a complaint:

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights of complaints at:

1-800-252-3439

You may write the Texas Department of Insurance:

P.O. Box 149104
Austin, Texas 78714-9104
FAX. (512) 475-1771

PREMIUM OR CLAIM DISPUTES:

Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

ATTATCH THIS NOTICE TO YOUR POLICY:

This notice is for information only and does not become a part or condition of the attached document.

**AVISO IMPORTANTE**

Para obtener información o para someter una queja

Puede comunicarse con el Departamento do Seguros de Texas para obtener información acerca de compañías, coberturas, derechos o quejas al:

1-800-252-3439

Puede escribir al Departamento de Seguros de Texas:

P.O. Box 149104
Austin, Texas 78714-9104
FAX: (512) 475-1771

DISPUTAS SOBRE PRIMAS O RECLAIMOS:

Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la componia primero. Si no se resuelve la disputa, puede entonces comunicarse con el Departamento (TDI).

UNA ESTE AVISO A SU POLIZA:

Este aviso es solo par propósito de información y no se convierte en parte o condición del documento adjunto.

# COMMERCIAL GENERAL LIABILITY DECLARATIONS

**POLICY NUMBER**
00012252-1

**JAMES RIVER INSURANCE COMPANY**
**7130 GLEN FOREST DRIVE, SUITE 210**
**RICHMOND, VA  23226-3754**

1.  **NAMED INSURED AND MAILING ADDRESS:**

    MGroup Holdings Inc; Holcomb Musemeche
    (See IL1201 form for Named Insured Schedule)
    1013 Van Buren Street
    Houston, TX 77019

    **PRODUCER: 10290**

    Colemont Insurance Brokers of Texas LP (DFW)
    5910 North Central Expressway, Suite 500
    Dallas, TX 75206-3450

2.  **POLICY PERIOD:** From 10/01/2006  to  10/01/2007  12:01 A.M. Standard Time at your Mailing Address above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, IN RELIANCE UPON THE STATEMENTS IN THE APPLICATION(S) AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| LIMITS OF INSURANCE | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $ | 1,000,000 |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT | $ | 50,000 Any one premises |
| MEDICAL EXPENSE LIMIT | | Excluded Any one person |
| MEDICAL EXPENSE AGGREGATE | | Excluded |
| PERSONAL & ADVERTISING INJURY LIMIT | $ | 1,000,000 Any one person or organization |
| GENERAL AGGREGATE LIMIT | $ | 2,000,000 |
| PRODUCTS/COMPLETED OPERATIONS AGGREGATE LIMIT | $ | 2,000,000 |

SURPLUS LINES TAX  *1794.02*
POLICY SERVICE  *500.00*
STAMPING FEE  *36.99*

| RETROACTIVE DATE (CG 00 02 ONLY) |
|---|
| THIS POLICY IS ON A CLAIMS-MADE AND REPORTED BASIS WHICH PROVIDES LIABILITY COVERAGE ONLY IF A CLAIM IS FIRST MADE AND REPORTED DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD.  THIS INSURANCE DOES NOT APPLY TO "BODILY INJURY", "PROPERTY DAMAGE" OR "PERSONAL AND ADVERTISING INJURY" WHICH OCCURS BEFORE THE RETROACTIVE DATE, IF ANY, SHOWN BELOW.
RETROACTIVE DATE:  NONE
(ENTER DATE OR "NONE" IF NO RETROACTIVE DATE APPLIES) |

| DESCRIPTION OF BUSINESS |
|---|
| FORM OF BUSINESS: Individual & Limited Corporation
BUSINESS DESCRIPTION:   Apartments |

| ALL PREMISES YOU OWN, RENT OR OCCUPY | |
|---|---|
| LOCATION NUMBER | ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
| 1 | Courts of Las Palomas |
| | 600 E General Cavazos, Kingsville, TX 78353 |
| 2 | Rancho Del Cielo |
| | 3375 McAllen Road, Brownsville, TX 78520 |
| 3 | Rancho Del Cielo II |
| | 3385 McAllen Road, Brownsville, TX 78520 |
| 4 | Beacon Bay Townhomes |
| | 306 Beacon Bay Dr, Port Isabel, tX 78578 |
| 5 | LaVista Townhomes |
| | 1715 Kingsway, Del Rio, TX 78840 |
| 6 | Kings Crossing Brooks |
| | 1505 E Corral, Kingsville, TX 78353 |
| 7 | Residences on Stillhouse Rd |
| | 2610 Stillhouse Rd, Pans, TX 75462 |
| 8 | LaVillita Townhomes |
| | 529 Old Port Isabel Rd, Brownsville, TX 78521 |
| 9 | Park Estates |
| | 1602-2026 Pruitt Hill Circle, Nacogdoches, TX |

| CLASSIFICATION AND PREMIUM | | | | | |
|---|---|---|---|---|---|
| LOCATION NUMBER | CLASSIFICATION | CODE NO. | PREMIUM BASE | RATE $ | ADVANCE PREMIUM $ |
| 1-6,8 | Swimming Pools-NOC * | 48925 | 7 Units | Included | Included |
| 1-9 | Apartment Buildings Other Than Greater New York * | 60010 | 890 Units | 41.000 | 36,490.00 |
| | | | | | |

| | | | |
|---|---|---|---|
| | | TOTAL PREMIUM (SUBJECT TO AUDIT) | $36,490.00 |
| If checked, premium shown is flat and not subject to audit ☐ | | Miscellaneous | $ 250.00 |
| TOTAL SHOWN IS PAYABLE: | | AT INCEPTION | $36,740.00 |
| | | | |
| AUDIT PERIOD (IF APPLICABLE) | | FREQUENCY: | |

| ENDORSEMENTS |
|---|
| ENDORSEMENTS ATTACHED TO THIS POLICY: |
| See attached schedule A – Schedule of Forms |

MC0001US 04-03                    Page 2 of 3

THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE
FORM(S) AND ANY ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.

# SCHEDULE A

FORMS AND ENDORSEMENTS THAT APPLY TO THIS POLICY:

POLICY NO. 00012262-1

| FORM NUMBER | DESCRIPTION |
|---|---|
| MC0001US-0403 | Commercial General Liability Declarations |
| GC0001US-0304 | Schedule A |
| CG0001-1001 | Commercial General Liability Coverage Form |
| AP0100US-0403 | Privacy Policy |
| AP2029US-1105 | Combined Policy Exclusions |
| AP2031US-1105 | Insured Versus Insured - Exclusion |
| AP2032US-0706 | Employers Liability Exclusion |
| AP2035US-1105 | Independent Contractors and Subcontractors Limitation |
| AP2036US-1105 | Absolute Pollution and Pollution Related Liability - Exclusion |
| AP2102US-0403 | Communicable Disease Exclusion |
| AP2103US-0906 | Minimum Policy Premium |
| AP2104US-1006 | Common Policy Conditions |
| AP2107US-0403 | Binding Arbitration |
| AP2112US-0804 | Terrorism Exclusion |
| AP5002US-0501 | Texas Notice Of Policyholder Complaint Procedures |
| AP5011US-1203 | Policy Limitation - Amended Aggregate Limits of Insurance per Location |
| CG2136-0196 | Exclusion - New Entities |
| CG2139-1093 | Contractual Liability Limitation |
| CG2167-0402 | Fungi or Bacteria Exclusion |
| GC2128US-0403 | Exclusion - Liquor Liability |
| GC2129US-0305 | Recreation Limitation Endorsement |
| GC2131US-0403 | Fiduciary Exclusion |
| GC2132US-0803 | Exclusion - Eviction |
| IL0021-0702 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| IL0985R-0103 | Disclosure Pursuant to Terrorism Risk Insurance Act of 2002 |
| IL1201-0403 | Policy Changes |
| MC2105US-1005 | Deductible Endorsement |
| MC2126US-0403 | Premium Base Endorsement |
| MC2139US-0403 | Exclusion - Coverage C - Medical Payments |

GC0001US 03-04                    1 of 1

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

   © ISO Properties, Inc., 2000

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to.

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

**(1)** Causing or contributing to the intoxication of any person;

**(2)** The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

**(3)** Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

**(1)** An "employee" of the insured arising out of and in the course of:

**(a)** Employment by the insured; or

**(b)** Performing duties related to the conduct of the insured's business; or

**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© ISO Properties, Inc., 2000

CG 00 01 10 01   □

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible, or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

© ISO Properties, Inc., 2000

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

h. Mobile Equipment

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

i. War

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

j. Damage To Property

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

© ISO Properties, Inc., 2000 CG 00 01 10 01 □

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance ; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

## 2. Exclusions

This insurance does not apply to:

a. **Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b. **Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

c. **Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

d. **Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

e. **Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f. **Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

g. **Quality Or Performance Of Goods – Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

h. **Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

i. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j. **Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of websites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

k. **Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

© ISO Properties, Inc., 2000
CG 00 01 10 01    □

l. **Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

m. **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

n. **Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**COVERAGE C MEDICAL PAYMENTS**

1. **Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

We will not pay expenses for "bodily injury":

a. **Any Insured**

To any insured, except "volunteer workers".

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

d. **Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. **Athletics Activities**

To a person injured while taking part in athletics.

f. **Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

g. **Coverage A Exclusions**

Excluded under Coverage A.

h. **War**

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee, and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

        © ISO Properties, Inc., 2000        CG 00 01 10 01        □

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured.

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      (1) "Bodily injury" or "personal and advertising injury":

         (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

         (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

         (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

         (d) Arising out of his or her providing or failing to provide professional health care services.

      (2) "Property damage" to property:

         (a) Owned, occupied or used by,

         (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

         you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

   a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

   b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard"

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to 6. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. Bankruptcy

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

© ISO Properties, Inc., 2000

CG 00 01 10 01          □

b. If a claim is made or "suit" is brought against any insured, you must:

  (1) Immediately record the specifics of the claim or "suit" and the date received; and

  (2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

  (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

  (2) Authorize us to obtain records and other information;

  (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

  (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**3. Legal Action Against Us**

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4. Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

b. **Excess Insurance**

This insurance is excess over:

  (1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

    (a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

    (b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

    (c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

    (d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I – Coverage A – Bodily Injury And Property Damage Liability.

  (2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

© ISO Properties, Inc., 2000

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us, and

c. We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

© ISO Properties, Inc., 2000

CG 00 01 10 01    □

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in a. above;

      (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

   Paragraph f. does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

 © ISO Properties, Inc., 2000 ☐

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

      (1) Equipment designed primarily for:

         (a) Snow removal;

         (b) Road maintenance, but not construction or resurfacing; or

         (c) Street cleaning;

      (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

      (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

   © ISO Properties, Inc., 2000   CG 00 01 10 01   □

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes

    (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    (2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

    (1) Work or operations performed by you or on your behalf; and

    (2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes

    (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

    (2) The providing of or failure to provide warnings or instructions.

© ISO Properties, Inc., 2000

# James River Insurance Company
## Privacy Policy

**We do not sell customer information to nonaffiliated third parties, and we do not share customer information with nonaffiliated third parties except those parties who perform contractual services for us, and parties to which we are authorized to provide information by law.** In addition, when we provide information to affiliates or non-affiliates, we limit those disclosures to information about your transactions and experiences with us and to disclosures otherwise permitted by law. You do not need to take any action to prevent us from selling or sharing information we obtain about you.

**We use security measures and training in our effort to protect the customer information we collect.** We protect the information we obtain about you by maintaining physical, electronic and procedural safeguards.

**We collect the following types of information about you when you purchase or use our products and services.** Most of the information that we obtain about you comes directly from you, such as through the insurance applications you submit when requesting insurance products. These applications and other inquiries we make of you allow us to learn information that we may use to contact you in the future, such as your name, address, telephone number and e-mail address. In addition, insurance applications and other information you provide enables us to determine the type and value of your insured property, the types of insurance coverages you have or in which you might be interested, and similar information.

If you visit an Internet site that we maintain, we might request or obtain information that will enable us to identify you as a registered user, such as your name, a user identification name, a password, password reminders, and your Internet service provider. We might use a "cookie" to retain some of this information. We also might obtain information about your operating system, web browser and similar information to enable us to improve the operation of our site.

When we consider products and services in which you may be interested, we often review information that we have about your past transactions with us or our affiliates, such as your existing or former policy coverages, premiums and payment history. In addition, we may learn information about your transactions with nonaffiliated third parties, including the types of products or services you obtained from them and your experiences with them. Finally, we may obtain other information from third parties that has a bearing upon your eligibility for the products or services you seek from us. This information may include your credit report or information about your creditworthiness, or other information maintained by consumer reporting agencies.

**We provide customer information only to our affiliates and to nonaffiliates that must protect your customer information.**

**We also may provide information as mentioned in this notice to nonaffiliated third parties that perform services for us or perform functions on our behalf, such as marketing and research, or to other financial institutions with which we have joint agreements for activities such as marketing. By law, our contracts with these parties must prevent them from using the information they receive about you except as described in this notice.**

Finally, we may share customer information as permitted by applicable law. This means that we will share information with parties as necessary to affect, administer, or enforce transactions that you request. For example, we might provide information to a company that processes, prints and mails our insurance policies to you, or to a company that adjusts claims under your policies. We also might disclose customer information to other entities specified by law, such as insurance advisory organizations, our attorneys and accountants, consumer reporting agencies, or civil and regulatory authorities. Federal law sets the limitations on these types of disclosures.

**We strive to keep our records as accurate as possible.** We attempt to maintain accurate records about you and we will gladly make appropriate corrections when you notify us. Of course, we do not control the accuracy of information gathered and provided by third parties, and you may need to notify third parties directly if you believe that any information we received from them is inaccurate. You may request the name and address of any consumer-reporting agency from which we obtain a report on you. You then may contact that consumer-reporting agency to request a copy of the report it makes or to advise of any changes to the information they maintain and report.

We will provide one copy of this Privacy Policy to joint contract holders. Please share this information with everyone covered under your policy or contract.

AP0100US 04-03                    Page 1 of 1

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# COMBINED POLICY EXCLUSIONS

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The following exclusions are added to this policy:

ABSOLUTE ASBESTOS, LEAD OR SILICA EXCLUSION

Injury or damages, including any claim or suit, arising out of, resulting from, caused or contributed to by Asbestos, Lead or Silica is not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising or alleged to have arisen out of same, including but not limited to any:

    a. "Bodily injury", "personal and advertising injury", "property damage" or damages of any type, arising out of the inhalation, ingestion, physical exposure to, absorption of, or toxic substances of or from Asbestos, Lead or Silica in any form, or from any goods, products or structures containing same, or "property damage" or devaluation of property arising from any form of same; or

    b. Existence of Asbestos, Lead, or Silica, in any form, in occupancy or construction, or the manufacture, sale, transportation, handling, storage, disposal, or removal of same, or goods or products containing same; or

    c. Loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order, governmental authority or directive or that of any private party or citizen action that any insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to or assess the effects of Asbestos, Lead, or Silica, or (2) any litigation or administrative procedure in which any insured or others may be involved as a party in response to the effects or alleged effects of Asbestos, Lead, or Silica; or

    d. Supervision, instructions, recommendations, requests, warnings or advice given or which should have been given, as well as any costs, including but not limited to abatement, mitigation, removal, containment, treatment, detoxification, neutralization, or disposal of same or in any way responding to or assessing the effects of same; or

    e. Actual or alleged Asbestosis, Lead poisoning, Silicosis or any other similar condition.

This exclusion applies regardless of whether:

    a. Injury or damage claimed is included within the "products/completed operations hazard" of the policy; or

    b. An alleged cause for the injury or damage is the insured's negligent hiring, placement, training, supervision, retention, act, error or omission.

CLAIM(S) IN PROGRESS EXCLUSION

    a. This policy does not apply to "bodily injury", "personal and advertising injury" or "property damage" which begins or takes place before the inception date of coverage, whether such "bodily injury", "personal and advertising injury" or "property damage" is known to an insured, even though the nature and extent of such damage or injury may change and even though the damage may be continuous, progressive, cumulative, changing or evolving, and even though the "occurrence" causing such "bodily injury", "personal and advertising injury" or "property damage" may be or may involve a continuous or repeated exposure to substantially the same general harm.

    b.  All "property damage" to units of or within a single project or development, and arising from the same general type of harm, shall be deemed to occur at the time of damage to the first such unit, even though the existence, nature and extent of such damage or injury may change and even though the "occurrence" causing such "property damage" may be or involve a continuous or repeated exposure to substantially the same general harm which also continues or takes place (in the case of repeated exposure to the substantially the same general harm) during the policy term.

## DISCRIMINATION EXCLUSION

Discrimination charges, of any kind, actual and alleged, are not covered under this policy, nor are any expenses or obligation to share damages with or repay another who must pay damages from same.

## EMPLOYMENT-RELATED PRACTICES EXCLUSION

Employment-Related Practices, regardless of allegations, are not covered under this policy nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same, including but not limited to:

    a.  Refusal to employ any person or termination of employment of any person; or

    b.  Any employment-related practices, policies, acts or omissions, including but not limited to coercion, demotion, evaluation, reassignment, discipline, defamation, harassment in any form, humiliation, or discrimination; or

    c.  Consequential "bodily injury" or "personal and advertising injury" as a result of a. or b.

## CLASSIFICATION LIMITATION EXCLUSION

The coverage provided by this policy applies only to those operations specified in the applications(s) for insurance on file with the Company and described under the description of operations or classification on the declarations of the policy.

## DAMAGES LIMITATION EXCLUSION

Damages mean a monetary judgment, award, or settlement.  Damages do not include:

    a.  Civil or criminal fines, sanctions or penalties, whether imposed pursuant to statute or otherwise; or

    b.  Judgments or awards arising from acts or omissions deemed uninsurable by law; or

    c.  The restitution of consideration or expense paid to you for professional services rendered or which should have been rendered; or

    d.  Disputed fees or any actual or alleged personal profit or advantage to which you are not legally entitled; or

    e.  Equitable or non-pecuniary relief.

## DUTY TO DEFEND EXCLUSION

Where there is no coverage under this policy, there is no duty to defend.

## PROFESSIONAL LIABILITY EXCLUSION

Professional liability, malpractice, errors, omissions, or acts of any type including rendering or failure to render any type of professional service is not covered under this policy nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same, unless such coverage is specifically endorsed onto this policy.

**WAR RISK EXCLUSION**

If this policy includes a war exclusion, such exclusion is deleted and replaced with the following exclusion:

This Company shall not be liable for loss caused directly or indirectly by:

  a. Hostile or warlike action in time of peace or war, including any action in hindering, combating or defending against an actual, impending or expected attack by:

    (1) Any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces; or

    (2) Military, naval or air forces; or

    (3) An agent of such government, power, authority or forces, it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission or fusion shall be conclusively presumed to be such hostile or warlike action by such a government, power, authority or forces.

  b. Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an occurrence.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

AP2029US 11-05                      Page 3 of 3

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# INSURED VERSUS INSURED – EXCLUSION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

This insurance does not apply to "bodily injury", "personal and advertising injury" or "property damage" or any other claim for damages brought by any insured covered by this policy against any other insured that has ownership interest in, is operated, controlled, or managed by or is a subsidiary of any such insured.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYER'S LIABILITY – EXCLUSION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The Employer's Liability exclusion under **SECTION I—2. Exclusions**, of this policy is deleted and replaced with the following:

This insurance does not apply to any claim, suit, cost or expense arising out of "bodily injury" to:

- a. Any employee of any Insured arising out of and in the course of:
  - (1) Employment by any insured; or,
  - (2) Performing duties related to the conduct of any Insured's business; or
- b. The spouse, child, parent, brother, sister or relative of that employee as a consequence of Paragraph a. above

This exclusion applies:

- a. Whether any insured may be liable as an employer or in any other capacity; and/or
- b. To any obligation to share damages with or repay someone else who must pay damages because of the injury; and/or
- c. To liability assumed under any "insured contract".

Wherever the word "employee" appears above, it shall mean any member, associate, "leased worker", "temporary worker" or any person or persons loaned to or volunteering services to you.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

AP2032US 07-06                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INDEPENDENT CONTRACTORS AND SUBCONTRACTORS LIMITATION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

Coverage provided under this policy for "bodily injury", "personal and advertising injury" or "property damage" caused by acts of independent contractors/subcontractors contracted by you or on your behalf shall not apply unless the contractor/subcontractor contracted by you or on your behalf maintains insurance coverage and limits of insurance equal to or greater than the insurance coverage and limits of insurance provided by this policy and naming you as an Additional Insured.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ABSOLUTE POLLUTION AND POLLUTION RELATED LIABILITY – EXCLUSION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The following exclusion is added to this policy.  If the policy already includes a pollution exclusion or a pollution-related exclusion, such exclusion(s) is(are) deleted and replaced with the following:

Pollution/environmental impairment/contamination is not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising out of or alleged to have arisen out of same. All liability and expense arising out of or related to any form of pollution, whether intentional or otherwise and whether or not any resulting injury, damage, devaluation, cost or expense is expected by any insured or any other person or entity is excluded throughout this policy

This insurance does not apply to any damages, claim, or suit arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" including but not limited to any:

a.   "Bodily injury", "personal and advertising injury", "property damage", or damages for the devaluation of property, or for taking, use or acquisition or interference with the rights of others in or on property or air space, or any other type injury or expense; or

b.   Any loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order, governmental authority or directive or that of any private party or citizen action that any insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess same, the effects of "pollutants", environmental impairments, contaminants or (2) any litigation or administrative procedure in which any insured or others may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or placement of "pollutants", environmental impairments, or contaminants into or upon land, premises, buildings, the atmosphere, any water course, body of water, aquifer or ground water, whether sudden, accidental or gradual in nature or not, and regardless of when.

This exclusion applies regardless of whether:

a.   Injury or damage claimed is included within the "products-completed operations hazard" of the policy; or

b.   An alleged cause for the injury or damage is the insured's negligent hiring, placement, training, supervision, retention, act, error or omission.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

The following definition is added to the policy.  If the policy already includes a definition of "pollutants" such definition is deleted and replaced with the following:

"Pollutants" mean any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or "waste". "Waste" includes medical waste, biological infectants, and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# COMMUNICABLE DISEASE EXCLUSION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

This Policy does not apply to any claim or suits based on or directly or indirectly arising out of or resulting from:

1. Any form of communicable disease; or
2. Any sexually transmitted disease; or
3. Any form of inhalation, absorption or contact; or
4. Acquired Immunodeficiency Syndrome, or Human Immunodeficiency Virus, or exposure to another having the same, or to substances or materials contaminated with the same; or
5. Failure by an insured to perform services which were either intended to or assumed to prevent communicable diseases or their transmission to others; or
6. Fear of contracting Acquired Immunodeficiency Syndrome, Human Immunodeficiency Virus, or any other communicable disease, or
7. The negligent:
   a. employment,
   b. investigation,
   c. placement,
   d. supervision,
   e. reporting to the proper authorities or failure to so report,
   f. hiring,
   g. training or
   h. retention
   
   of a person for whom any insured is or ever was responsible and whose conduct is excluded in 1. through 6. above

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

AP2102US 04-03                    Page 1 of 1

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# MINIMUM POLICY PREMIUM

This endorsement modifies and amends insurance provided under the following:

ALL COVERAGE PARTS

This endorsement sets forth the minimum earned premium for the policy. The minimum earned premium for this policy is calculated in accordance with the following:

1. The minimum premium for the policy period is the total policy premium as shown on the policy declarations page plus any premium adjustment by endorsements and any additional premium developed by audit.

2. Audits that indicate a return premium will not reduce the minimum as stated in paragraph 1.

3. If the insured cancels this policy and the policy is not subject to audit, the return premium will be 90% of the unearned policy premium; however in no event will the Company retain less than 25% of the minimum premium shown in paragraph 1. above

4. If the insured cancels this policy and the policy is subject to audit, the earned premium will be determined by final audit, however in no event will it be less than 25% of the minimum premium as described in paragraph 1. above.

5. If the Company cancels the policy for any reason, other than for non-payment of premium, then the insured will be returned the full amount of the unearned premium without any minimum premium restrictions.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

AP2103US 09-06                    Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMON POLICY CONDITIONS

All Coverage Parts in this policy are subject to the following Conditions.

## 1. CANCELLATION AND NON-RENEWAL

A. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

B. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

(1) 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

(2) 30 days before the effective date of cancellation if we cancel for any other reason.

C. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

D. Notice of cancellation will state the effective date of cancellation. The policy will end on that date.

E. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

F. If notice is mailed, proof of mailing will be sufficient proof of notice.

If we elect not to renew this policy, we shall mail written notice to the First Named Insured at the address shown in the Declarations. Such written notice of non-renewal shall be mailed at least 30 days prior to the end of the policy term

## 2. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## 3. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring suit or transfer those rights to us and help us enforce them.

## 4. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this policy unless:

A. There has been full compliance with all of the terms of this policy; and

B. No suit, action or proceeding for the recovery of any claim under this policy shall be sustainable in any court of law or equity the same be commenced within twelve (12) months next after discovery by the insured of the occurrence which gives rise to the claim, provided however, that if by the laws of the state within which this policy is issued each limitation is invalid, then any such claims shall be void unless such action, suit or proceeding be commenced within the shortest limit of time permitted by the laws of such state. We will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable Limit of Insurance.

## 5. REPRESENTATIONS

By accepting this policy, you agree:

A. The statements in the Declarations are accurate and complete;

AP2104US 10-06            Page 1 of 2

B. Those statements are based upon representations you made to us; and

C. We have issued this policy in reliance upon your representations.

6. **SERVICE OF SUIT**

It is agreed that in the event of the failure of this Company to pay any amount claimed to be due hereunder, this Companywill submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court.

It is further agreed that service of process in such suit may be made upon the Company's President, or his nominee, at 7130 Glen Forest Drive, Suite 210, Richmond, Virginia 23226 and that in any suit instituted against any one of them upon this policy, this Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named is authorized and directed to accept service of process on behalf of this Company in any such suit and/or upon the request of the insured to give a written undertaking to the insured that it or they will enter a general appearance upon this Company's behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America, which makes provision therefore, this Company hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

7. **TERMS, CONDITIONS AND PREMIUM**

On each renewal, continuation, anniversary of the effective date of the policy or on an annual basis, the Company will determine the rate and premium and/or amend the terms and conditions in accordance with the rates and rules then in effect.

In Witness Whereof, this Company has executed and attested these presents; but this policy shall not be valid unless signed by duly authorized representatives of this Company.

*SECRETARY*                                                           *PRESIDENT*

AP2104US 10-06                    Page 2 of 2

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# BINDING ARBITRATION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

Should we and the insured disagree as to the rights and obligations owed by us under this policy, including the effect of any applicable statutes or common law upon the contractual obligations otherwise owed, either party may make a written demand that the dispute be subjected to binding arbitration.

When such a request is made, The American Arbitration Association shall be used, with each party selecting an arbitrator from the list of qualified arbitrators for insurance coverage disputes provided by that Association. The two chosen arbitrators shall select a third arbitrator from the same list; if they cannot agree to a selection, The American Arbitration Association shall make the selection for them. Each party shall bear the costs of its arbitrator and shall share equally the costs of the third arbitrator and of the arbitration process. A decision agreed to by two of the arbitrators will be binding.

In the event you prevail in the arbitration and we promptly offer to you arbitration costs and reasonable attorney fees incurred in connection therewith, in addition to the disputed contract benefit, you shall have no right to sue us for breach of implied covenants or unreasonable withholding of contract benefits.

To the extent that we prevail in the arbitration, the arbitrators may award us any expenses and/or damages incurred or paid under reservation of rights in excess of our contract obligations as determined by the arbitrators.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

AP2107US 04-03          Page 1 of 1

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# TERRORISM EXCLUSION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The coverage under this policy does not apply to any loss, injury, claim or damage arising directly or indirectly out of or relating to:

1. Any act of "terrorism"; or

2. Any action authorized by a government authority or agency for the purpose of preventing or minimizing the consequences of any act or threat of "terrorism".

"Terrorism" means an activity by an individual acting alone, or individuals acting as a part of a group, that involves any violent act, including the threat of any activity or preparation for an activity that:

1. Causes either:

   a. Damage to property;

   b. Injury to person(s); or

   c. Loss of income or increased expense; and

2. Appears to be intended to:

   a. Intimidate or coerce a civilian population;

   b. Disrupt any segment of an economy,

   c. Influence the policy of a government by intimidation or coercion;

   d. Affect the conduct of a government by destruction, assassination, kidnapping or hostage-taking; or

   e. Advance a political, religious or ideological cause; or

3. Involves the use, release, dispersal, discharge, escape or application of:
   a. Nuclear materials, or directly results in nuclear reaction or radiation or radioactive contamination; or

   b. Pathogenic or poisonous biological or chemical materials.

"Terrorism" shall also include any incident determined to be such by any official, department or agency that has been specifically authorized by federal statute to make such a determination.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**



**JAMES RIVER**

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|
| To obtain information or make a complaint: | Para obtener informacion o para someter una queja: |
| You may write to James River Insurance Company at: | Usted tambien puede escribir a James River Insurance Company : |
| 7130 Glen Forest Drive, Suite 210<br>Richmond, Virginia   23226 | 7130 Glen Forest Drive, Suite 210<br>Richmond, Virginia   23226 |
| You may contact the Texas Department of Insurance<br>To obtain information on companies, coverages,<br>Rights or complaints at: | Puede comunicarse con el Departamento de Seguros de<br>Texas para obtener informacion acerca de companias,<br>coberturas, derechos o quejas al : |
| 1-800-252-3439 | 1-800-252-3439 |
| You may write the Texas Department of Insurance at: | Puede escribir al Departamento de Seguros de Texas |
| P.O. Box 149104<br>Austin, TX   78714-9104<br>Fax #   (512) 475-1771 | P.O. Box 149104<br>Austin, TX   78714-9104<br>Fax #   (512) 475-1771 |
| **PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim, you should contact the agent first.  If the dispute is not resolved, you may contact the Texas Department of Insurance. | **DISPUTAS SOBRE PRIMAS O RECLAMOS:** Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el (agente) (la compania) (agente o la compania) primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI). |
| **ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part  or condition of the attached document. | **UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto. |
| | |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# POLICY LIMITATION – AMENDED AGGREGATE LIMITS OF INSURANCE PER LOCATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SECTION III – LIMITS OF INSURANCE - The General Aggregate Limit applies separately to each "Location" of the Named Insured.

Notwithstanding the application of the General Aggregate Limit to each "Location" of the Named Insured, under no circumstances will we pay more than **$10,000,000** for all claims under this policy that are subject to the General Aggregate limit.

For the purpose of this endorsement, the following definition is added:

"Location" means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

AP5011US 12-03                    Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 21 36 01 96

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION – NEW ENTITIES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Paragraph 4. of Section II, WHO IS AN INSURED does not apply.

 Copyright, Insurance Services Office, Inc., 1994   □

COMMERCIAL GENERAL LIABILITY
CG 21 39 10 93

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CONTRACTUAL LIABILITY LIMITATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

The definition of "insured contract" in the DEFINITIONS Section is replaced by the following:

"Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement.

Copyright, Insurance Services Office, Inc., 1992

COMMERCIAL GENERAL LIABILITY
CG 21 67 04 02

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# FUNGI OR BACTERIA EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2., Exclusions of **Section I – Coverage A – Bodily Injury And Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

**a.** "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**b.** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption

**B.** The following exclusion is added to Paragraph 2., Exclusions of **Section I – Coverage B – Personal And Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**Fungi or Bacteria**

**a.** "Personal and advertising injury" which would not have taken place, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury.

**b.** Any loss, cost or expense arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

**C.** The following definition is added to the **Definitions Section:**

"Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.

     © ISO Properties, Inc., 2001         □

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - LIQUOR LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE

SECTION I – COVERAGES
COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

2. Exclusions c. Liquor Liability is deleted and replaced with the following:

The coverage under this policy does not apply to "bodily injury", "property damage", or "personal and advertising injury" arising out of:

1. Causing or contributing to the intoxication of any person;
2. The furnishing of alcoholic beverages to anyone under the legal drinking age or the influence of alcohol;
3. Any statute, ordinance or regulation relating to sales, gift, distribution or use of alcoholic beverages;
4. Any act or omission by any insured, any employee of the any insured, patrons, members, associates, volunteers or any other person providing or failing to provide transportation, detaining or failing to detain any person, or any act of assuming or not assuming responsibility for the well being, supervision or care of any person allegedly under or suspected to be under the influence of alcohol; or
5. The negligent hiring, employment, training, placement or supervision of any person doing work for or otherwise acting on behalf of the insured.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RECREATION LIMITATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1. Swimming pools, spas, Jacuzzis or saunas unless:

   A. Trained, certified Lifeguards are present, or in their absence

      (1) Pool, spa and Jacuzzi areas contain all appropriate and required safety and warning signs, prominently displayed, including but not limited to: – (suggested wording)

         a) "Life Guard Not Present, Swim at Own Risk".

         b) "No one under Age 14 allowed without Adult Supervision".

         c) "No alcoholic beverages permitted".

         d) "No Glass Containers Allowed in Pool Area".

         e) "Pregnant women or persons with heart problems should consult a physician before using spa, Jacuzzi or sauna facilities".

         f) Permitted hours of operation.

   B. Pool, spa or Jacuzzi areas are completely fenced and secured when not in use;

   C. Pool depths are clearly marked and flotation ropes separate shallow from deep end.

   D. The proper chemicals have been used in the treatment of water found in pools, spas, saunas or Jacuzzis.

2. Any diving boards, platforms, slides, or similar apparatus provided, maintained, or used in connection with any pools, lakes, rivers or other bodies of water on the insured's premises.

3. The ownership or use of any animals whether owned by you, on your property or in your care, custody or control.

**ALL OTHER TERMS AND CONDITONS OF THE POLICY REMAIN UNCHANGED.**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# FIDUCIARY EXCLUSION

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

This policy does not apply to any claim arising out of the:

1. Coercion, conversion or misappropriation of others' funds or property;
2. Any dishonest, fraudulent, criminal, malicious acts or omissions of the insured, partner or employee or any person for whom you are legally responsible; or
3. Any activities or operations performed in the capacity of a fiduciary.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION – EVICTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE

The coverage under this policy does not apply to "bodily injury", "property damage" or "personal or advertising injury" arising out of the eviction of, threat to evict or failure to evict any tenant or occupant of any property.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

IL 00 21 07 02

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

© ISO Properties, Inc., 2001                   □

2. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor"

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2001

IL 00 21 07 02

POLICY NUMBER: «QuoteNumber»                                    IL 09 85 01 03

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT OF 2002

**SCHEDULE***

---

### THE INSURED WAS OFFERED AND

### HAS DECLINED TERRORISM COVERAGE ON THIS POLICY

---

\*   Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Insurance Act of 2002, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.

IL 09 85 01 03                    © ISO Properties, Inc., 2003                    Page 1 of 1    □

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| 00012262-1 | 10/1/2006 12:01 AM Standard Time at the address of the Named Insured | James River Insurance Company |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| MGroup Holdings Inc<br>Holcomb Musemeche | Michael P. Kehoe |

COVERAGE PARTS AFFECTED
ALL COVERAGE PARTS

**Named Insureds Schedule:**

MGroup Holdings Inc
Holcomb Musemeche
Affordable Housing of Kingsville Ltd
Courts of Las Palomas
Rancho Del Cielo Ltd dba Rancho Del Cielo Apartments
Rancho Del Cielo Associates II Ltd dba
Rancho Del Cielo Phase II
Housing Associates of Port Isabel dba
Beacon Bay Townhomes
Housing Associates of Del Rio Ltd
La Vista Townhomes
Affordable Hosuing of Kingsville I Ltd dba
King's Crossing
Housing Associates of Paris Ltd dba
Residences on Stillhouse Road
Housing Associates of Nacogdoches Ltd dba
Park Estates
Housing Associates of Brownsville Ltd dba
La Villita Apartments

Authorized Representative Signature

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# DEDUCTIBLE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Coverage | Amount and Basis of Deductible | |
|---|---|---|
| | PER CLAIM   or   PER OCCURRENCE | |
| Bodily Injury Liability | $ | $ |
| OR | | |
| Property Damage Liability | $ | $ |
| OR | | |
| Personal & Advertising Injury | $ | $ |
| OR | | |
| Damage To Premises Rented To You | $ | $ |
| OR | | |
| Medical Payments | $ | $ |
| OR | | |
| Bodily Injury Liability and/or Property Damage Liability and/or Personal & Advertising Injury Liability, and/or Damage To Premises Rented To You and/or Medical Expense Combined | $ 2,500.00 | $ |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**APPLICATION OF ENDORSEMENT** (Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury", "property damage" or Personal and/or Advertising Injury or Medical Payment however caused):

A.   Our obligation under the Bodily Injury Liability, Property Damage Liability, Personal and/or Advertising Injury, Medical Payments or any other coverages provided by this policy to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages. The deductible amounts stated above will include loss payments, adjustments, investigative and legal fees and costs, all whether or not loss payment is made.

B.   We may select a deductible amount on either a per claim or a per "occurrence" basis. Our selected deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above. The deductible amount stated in the Schedule above applies as follows:

   1.   **PER CLAIM BASIS.** If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

      a)   Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

      b)   Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage";

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

c) Under Personal & Advertising Injury Liability, to all damages sustained by any one person or organization because of "personal and advertising injury";

d) Under Damage To Premises Rented To You, all damages to any one premises while rented to you, because of "property damage";

e) Under Medical Payments, to all medical expenses sustained by any one person; or

f) Under Bodily Injury Liability and/or Property Damage Liability and/or Personal & Advertising Injury Liability, Damage To Premises Rented To You, and/or Medical Payments Coverages Combined, to all injury, damage  and medical expenses sustained by any one person or organization

as the result of any one "occurrence" or "offense".

If damages are claimed for care, loss of services or death resulting at any time from "bodily injury", a separate deductible amount will be applied to each person making a claim for such damages.

With respect to "property damage", "person" includes an organization.

2. PER OCCURRENCE BASIS. If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

a) Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

b) Under Property Damage Liability Coverage, to all damages because of "property damage";

c) Under Personal & Advertising Injury Liability, to all damages because of "personal and advertising injury";

d) Under Damage To Premises Rented To You, all damages to any one premises while rented to you, because of "property damage";

e) Under Medical Payments, to all medical expenses because of an accident; or

f) Under Bodily Injury Liability and/or Property Damage Liability and/or Personal & Advertising Injury Liability Damage To Premises Rented To You, and/or Medical Payments Coverages Combined, to all injury, damage and medical expenses

as the result of any one "occurrence" or "offense", regardless of the number of persons or organizations who sustain damages because of that "occurrence" or "offense".

C. The terms of this insurance, including those with respect to:

1. Our right and duty to defend any "suits" seeking those damages; and

2. Your duties in the event of an "occurrence," claim, or "suit"

apply irrespective of the application of the deductible amount.

D. We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

# PREMIUM BASE ENDORSEMENT

One or more of the following symbols may be entered under the Premium Base column of the Commercial General Liability Coverage Form Declarations. These symbols designate the base used for determining your premium. The following is a definition of these symbols when used as a premium base.

Symbol Definition

**a "Area" means:** The total number of square feet of floor space at the insured premises, computed as follows:

For entire buildings, by multiplying the product of the horizontal dimensions of the outside of the outer building walls by the number of floors, including basements but do not use the area of the following.

1. Courts and mezzanine types of floor openings.

2. Portions of basements or floors where 50% or more of the area is used for shop or storage for building maintenance, dwelling by building maintenance employees, heating units, power plants or air-conditioning equipment.

3. For tenants, determine the area they occupy in the same manner as for the entire buildings.

The rates apply per 1,000 square feet of area.

**C "Total Cost" means:**

The total cost of all work let or sublet in connection with each specific project including:

1. The cost of all labor, materials and equipment furnished, used or delivered for use in the execution of the work.
2. All fees, bonuses or commissions made, paid or due.

The rates apply per $1,000 of total cost

**M "Admissions" means:**

The total number of persons, other than employees or the named insured, admitted to the event insured or to events conducted on the premises whether on paid admissions, tickets, complimentary tickets or passes.

The rates apply per 1,000 admissions.

**P "Payroll" means:**

1. Remuneration which includes money or substitutes for money.
2. Payroll includes:
   a  Commissions, bonuses, pay for holidays, vacations or periods of illness;
   b.  Extra pay for overtime.
   c.  Payments by en employer or amounts otherwise required by law to be paid by employees to statutory insurance or pension plans, such as Federal Social Security Act;
   d.  Payment to employees on any basis other than time worked, such as piece work, profit sharing or incentive plans;
   e.  Payment or allowance for hand tools or power tools used by hand provided by employees and used in their work or operations for the insured;

    f.   The rental value of an apartment or a house provided for an employee based on comparable accommodations;

    g.   Value of meals and lodging other than an apartment or house received by employees as part of their pay;

    h.   The value of store certificates, merchandise, credits or any other substitute for money received by employees as part of their pay;

    i.   The payroll of all drivers, mobile equipment operators and their helpers, whether or not the operators are designated or licensed to operate automobiles. If the operators and their helpers are provided to the insured along with equipment hired under contract and their actual payroll is not known, use 1/3 of the total amount paid out by the insured for the hire of the equipment;

    j.   The payroll of executive officers and individual insureds and co-partners;

    k.   Fees paid to employment agencies for temporary personnel provided to the insured;

1.   Payroll does not include:

    a.   Tips and other gratuities received by employees;

    b.   Payments by an employer to group insurance or group pension plans for employees in accordance with the manuals in use by us;

    c.   The value of special rewards for individual invention or discovery;

    d.   Dismissal or severance payments except for time worked or accrued vacation;

The rates apply per $1,000 of payroll.

**S** "Gross Sales" or "Receipts" means:

1.   The gross amount charged by the named insured, concessionaires of the named insured or by others trading under the insured's name for:

    a.   All goods or products, sold or distributed;

    b.   Operations performed during the policy period;

    c.   Rentals; and

    d.   Dues or fees.

2.   Inclusions

    The following items shall not be deducted from gross sales:

    a.   Foreign exchange discounts;

    b.   Freight allowance to customers;

    c.   Total sales of consigned goods and warehouse receipts;

    d.   Trade or cash discounts;

    e.   Bad debts; and

    f.   Repossession of items sold on installments (amount actually collected.)

3.   Exclusions

    The following items shall be deducted from gross sales:

    a.   Sales or excise taxes which are collected and submitted to a governmental division;

    b.   Credits for repossessed merchandise and products returned.

    c.   Allowances for damaged and spoiled goods;

    d.   Finance charges for items sold on installments;

    e.   Freight charges on sales if freight is charged as a separate item on customers invoice; and

    f.   Royalty income from patent rights or copyrights which are not product sales.

The rates apply per $1,000 of gross sales.

**t** "Each" means:

    The basis of premium involves units of exposure, and the quantity comprising each unit of exposure is indicated in the Declarations such as "per person."

The rates apply per unit of exposure.

u    "Unit" means:

A single room or group of rooms intended for occupancy as separate living quarters by a family, by a group of unrelated persons living together, or by a person living alone.

The rates apply per each unit.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION – COVERAGE C – MEDICAL PAYMENTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| ALL PREMISES AND CLASSIFICATIONS |
|---|

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any premises or classification shown in the Schedule:

**1.** Section I – Coverage C – Medical Payments does not apply and none of the references to it in the Coverage Part apply.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED**

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) |
|---|---|
| | 07/18/2007 |

| PRODUCER  (972)490-8800        FAX (972)490-2255 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | |
|---|---|---|
| Sovereign Insurance Group, Inc. Prestonwood Pond II 14860 Montfort Dr., Suite 150 Dallas, TX 75254 | | |
| | INSURERS AFFORDING COVERAGE | NAIC # |
| INSURED  MGroup Holdings, Inc. | INSURER A:  James Rivers | |
| | INSURER B:  Illinois National Ins. Co. | |
| 1013 Van Buren St Houston, TX 77019 | INSURER C: | |
| | INSURER D: | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY** <br> X COMMERCIAL GENERAL LIABILITY <br> CLAIMS MADE  X  OCCUR <br><br><br> GEN'L AGGREGATE LIMIT APPLIES PER: <br> POLICY   PRO-JECT   LOC | 00012262-1 | 10/01/2006 | 10/01/2007 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 50,000 |
| | | | | | | MED EXP (Any one person) | $ Excluded |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| | | **AUTOMOBILE LIABILITY** <br> ANY AUTO <br> ALL OWNED AUTOS <br> SCHEDULED AUTOS <br> HIRED AUTOS <br> NON-OWNED AUTOS | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** <br> ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN       EA ACC <br> AUTO ONLY:         AGG | $ <br> $ |
| B | | **EXCESS/UMBRELLA LIABILITY** <br> X OCCUR      CLAIMS MADE <br><br> DEDUCTIBLE <br> RETENTION      $ | EBU0832316 | 10/01/2006 | 10/01/2007 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | AGGREGATE | $ 1,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** <br> ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? <br> If yes, describe under SPECIAL PROVISIONS below | | | | WC STATU-TORY LIMITS    OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| | | **OTHER** | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
Certificate holder is additional insured/property manager on the general liability policy, as respects the following locations:  Housing Associates of Kingsville, LP; Housing Associates of Port Isabel, Ltd; Housing Associates of Del Rio, Ltd.; Housing Associates of Paris, LP; Housing Associates of Brownsville I, LTD; and Housing Associates of Brownsville II, LTD.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL  ENDEAVOR TO MAIL  30  DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. |
| Capstone Real Estate Services, Inc. 210 Barton Springs Road, #300 Austin, TX 78704 | AUTHORIZED REPRESENTATIVE Michael Sterlacci/HSTUAR |

ACORD 25 (2001/08)                                                                                          ©ACORD CORPORATION 1988



EXHIBIT

C

# IMPORTANT

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

# DISCLAIMER

The Certificate of Insurance on the reverse side of this form does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon.

ACORD 25 (2001/08)